(Nos. 55684, 56186.— ▮▮▮▮▮▮▮▮▮▮▮▮)

CINDY ZICK, Appellant, v. THE INDUSTRIAL COM-
MISSION *et al.* (Shaklee Company, Appellee).

*Opinion filed December 17, 1982.—Rehearing
denied January 28, 1983.*

354

SIMON, J., dissenting.

Gregory E. Rogus, of Brundage & Garr, Ltd., of Chicago, for appellant.

Galliani & Kuzel, of Chicago (William R. Galliani, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

Claimant, Cindy Zick, filed two claims for injuries sustained on September 7 and 11 of 1979, while in the employ of respondent, Shaklee Company. The causes were consolidated, and the arbitrator denied compensation as to each claim. With regard to the September 7 incident, he concluded that claimant "failed to prove that she sustained any disability as the result of said accidental injury." Claimant was denied continuing temporary total compensation for the injury sustained on September 11 because she "failed to prove that the present condition of ill being is causally related to the injury." The Industrial Commission affirmed the denial of compensation, and the circuit court of Cook County confirmed the decision of the Commission. The claimant brought a consolidated appeal directly to this court pursuant to Rule 302(a)(2). (73 Ill. 2d R. 302(a)(2).) However, she directs our attention only to that decision denying compensation for the injury sustained on September 11.

The sole issue on review is whether the Commission's decision is contrary to the manifest weight of the evi-

dence.

The evidence indicates that, prior to 1979, claimant had never experienced any problems related to her feet. On September 7 of that year, while employed by respondent as a stock clerk, claimant's left foot became caught between two pallets. As a result, she fell over some boxes and twisted her ankle. Claimant received medical attention at St. Francis Hospital. Her ankle was examined, X-rayed, and wrapped in an Ace bandage. She received no further medical attention for this injury. Claimant returned to work on September 11, and she testified that her ankle felt fine at that time.

During the afternoon of September 11, a forklift "lowered" on her left foot, allegedly resulting in the injury for which compensation is sought. Her supervisor applied cold packs to her foot, after which claimant returned to St. Francis Hospital. Her foot was again examined, X-rayed and wrapped in a bandage. She returned to work that afternoon. Although she worked the following day, she left early because of pain and swelling in her foot. Claimant has not since returned to work.

On September 14, she visited Holy Cross Hospital, where her foot was examined and medication prescribed. On approximately this same date she also consulted Dr. George Kotcher, her family physician. He prescribed pain medication, advised her not to work for a few weeks, and requested that she telephone him in three weeks. She never called him but instead, on her mother's recommendation, consulted Dr. Gerald Quinlan on October 23, 1979. Dr. Quinlan, a podiatrist, examined and X-rayed her foot, administered medication, and prescribed whirlpool and sensor-sound treatment. Claimant continued to see him four times each week. She received injections in her left foot for two or three weeks.

In November of 1979, Dr. Quinlan advised that she consult Dr. Stephen Smith, a doctor of podiatric medi-

cine. He arranged her admittance in Northlake Hospital that December and performed surgery on her left foot. Her sesamoid bones, which are small bones located in the tendons, were removed, and a metal pin was inserted in her left great toe. Following her release from the hospital, she continued to see Dr. Smith approximately once each week. However, claimant's condition failed to improve, and she was required to undergo surgery on two further occasions. Claimant testified that she still suffers extreme pain, and that her foot swells, runs a fever, and is subject to a discoloration which extends to her knee.

In addition to claimant's testimony, she introduced into evidence the deposition of Dr. Smith. He stated that, in his opinion, claimant sustained an injury to the sesamoid bones in her great toe joint. Based upon her history and exhibited symptoms, he believed that the injury was caused by trauma and was not a congenital condition. Dr. Smith indicated that surgery was performed in December because claimant's foot was not responding to the more conservative treatment of steroid injections and immobilization.

He further stated that he saw claimant again in February. At that time, there was diffused pain in her left foot, accompanied by swelling, stiffness and hyperalgesia (extreme sensitivity to pain). He determined that she had developed reflex sympathetic dystrophy, a condition which is triggered by an injury and results in fibrosis of the muscles, stiffness in the joints, pain, and an atrophy of the bone. Because of her perceived condition, an operation which Dr. Smith termed a "regional sympathetic block" was performed. He has continued to see the claimant following surgery and believes that she is unable to return to work.

On cross-examination, Dr. Smith stated that, in his opinion, claimant suffered from a separated or fractured

tibia or sesamoid bone in her left foot, a condition resulting from trauma. He did not recall if there was any callus formation in the area of the injury. Nor did he recall if there was a congenital bipartite lateral sesamoid beneath the bone of the first metatarsal. Dr. Smith described a bilateral sesamoid as a congenital condition in which the sesamoid bone develops in two pieces instead of one. He did not believe she had this condition because it is not painful. Finally, Dr. Smith did not recall if there was a separation of sesamoids in the right foot. He indicated that such a condition could be relevant to a comparative diagnosis. He also stated that the condition of reflex sympathetic dystrophy was not present prior to surgery. He later qualified this statement and testified that there was insufficient information, prior to the first operation, to support a diagnosis.

Respondent introduced into evidence the depositions of two doctors. Dr. William Fischer, a physician specializing in orthopedic surgery, stated that he examined the claimant in March of 1980 and reviewed the roentgenologist's report relating to her X ray taken on September 11. The report stated that the "[e]xamination of the left great toe reveals no evidence of a recent fracture, dislocation or osseous [bone or joint] pathology." Dr. Fischer concurred with the roentgenologist's report. He stated that claimant suffered from a congenital bipartite lateral sesamoid bone beneath the distal first metatarsal of the left foot. This condition is characterized by the smooth margins and concentric trabecular lines of the two bone pieces. He stated that, if the bone were fractured, the bone margins would be rough and the trabecular line would be broken. Further, between September and November of 1979, there was no callus formation or other indicia of healing characteristic of a fracture.

Dr. Fischer further stated that, in the absence of a fracture, the surgery was unnecessary and "may be ia-

trogenic." He defined "iatrogenic" as a condition caused by overtreatment. He indicated that there was no relationship between the original injury and her current condition, except that the September incident is where "it all started." "But where it's gotten from there is a considerable difference." In his opinion, claimant now suffers from an entrapment of the medial plantar nerve in the great toe, which precipitates considerable pain and resulting disability. This condition has no relationship to the original injury in September. Finally, Dr. Fischer indicated that claimant's acute symptoms would have eventually subsided "just by conservative care, rest, and a bandaging of [the foot]." On cross-examination, he reiterated his opinion that it is highly unlikely that claimant's condition of ill-being was caused by the incident in September.

Dr. William Meszaros, a physician specializing in radiology, was also deposed by respondent. He did not examine claimant but did review her X rays. He concurred with Dr. Fischer's analysis that claimant suffered from a bipartite lateral sesamoid bone beneath the distal first metatarsal of the left foot. He stated that this was a relatively rare congenital anomaly which was not caused by any trauma. In his opinion, there was no evidence of any fracture. On cross-examination, Dr. Meszaros stated that the X rays did not reveal any injury to the soft tissue of the left foot. On redirect examination, he indicated that such a condition would be visible on an X ray only if it reached "a certain degree."

Claimant states that the arbitrator found there is no causal relationship between the injury and her present condition of ill-being. She infers from these findings that the arbitrator determined she is disabled as a result of a work-related injury. We find nothing in the record to support this inference. Building upon this false premise, she argues that the arbitrator must have found there

was no causal relationship because her disability was precipitated by an intervening cause. Claimant asserts that the only intervening cause supported by the record was the possible mistreatment of her injury by Drs. Smith and Quinlan. She cites *International Harvester Co. v. Industrial Com.* (1970), 46 Ill. 2d 238, for the proposition that a causal relationship between the injury and disability is sufficiently established where the treatment would not have been rendered but for the original injury.

Respondent notes that Dr. Smith stated he treated claimant for a fracture which resulted from trauma. However, Drs. Fischer and Meszaros indicated that her disability was due to a congenital anomaly for which she received improper medical treatment. It is therefore argued that there is no causal relationship between claimant's disability and the incident of September 11.

As can be seen, the arbitrator did not state the basis upon which he concluded claimant's injury and disability were not causally related. Claimant did not request specific findings. Although respondent's evidence established a possible mistreatment of her condition, this was not the real issue before the arbitrator. The question was whether her disability resulted from trauma, or whether it was due to a congenital anomaly aggravated by medical mistreatment.

Matters of causation and other questions of fact are to be decided by the Commission. (See *Ross v. Industrial Com.* (1980), 79 Ill. 2d 258, 261.) Similarly, "where there is conflicting medical testimony it is for the Commission to determine which testimony it will prefer and accept." (*Pathfinder Co. v. Industrial Com.* (1976), 62 Ill. 2d 556, 567-68; *White v. Industrial Com.* (1982), 88 Ill. 2d 523, 526; see also *Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283, 286-87.) This court may not set aside the Commission's decision even though we may

draw different inferences from the record. (*White v. Industrial Com.* (1982), 88 Ill. 2d 523, 526; *Swift & Co. v. Industrial Com.* (1967), 37 Ill. 2d 145, 147.) The Commission's decision will be reversed only where it is contrary to the manifest weight of the evidence. *General Electric Co. v. Industrial Com.* (1982), 89 Ill. 2d 432, 435; see *Howard v. Industrial Com.* (1982), 89 Ill. 2d 428, 431.

As previously noted, claimant's physician stated that her disability was due to a fracture caused by trauma. Respondent's physicians indicated that she suffered from a mistreated congenital anomaly which was unrelated to the incident of September 11. The Commission chose to believe respondent's evidence, and we cannot say that this decision was contrary to the manifest weight of the evidence.

Claimant next argues that, even if her treating physicians were guilty of malpractice, respondent remains liable. She cites several cases which hold an employer is liable for new injuries, or for the aggravation of an injury, due to medical malpractice. (*E.g., Huntoon v. Pritchard* (1939), 371 Ill. 36; *Lincoln Park Coal & Brick Co. v. Industrial Com.* (1925), 317 Ill. 302.) Further, she points out that she was obligated to seek medical treatment, and it would be unfair to deny her recovery if her disability resulted from such treatment.

Respondent submits that claimant advanced the malpractice issue to obscure the fact that she received treatment in response to a congenital condition. It further argues that the treatment was unreasonable and unnecessary, and that therefore the employer should not be held responsible for claimant's current disability.

Claimant's malpractice argument must fail. As claimant concedes, many of the relevant cases involved malpractice committed by doctors who were provided by the employer, or to whom an employee was referred by the

employer. Contrary to claimant's contention, this court, in awarding compensation, emphasized the fact that the doctor was selected by the employer.

For example, in *Lincoln Park Coal & Brick Co. v. Industrial Com.* (1925), 317 Ill. 302, cited by the claimant, the respondent required an employee to undergo a medical examination conducted by a doctor that respondent selected. During the examination, and as a result of the doctor's negligence, the employee was burned by an X-ray machine. In holding the injury compensable, this court stated:

> "[Respondent] refused to pay further compensation until the nature, extent and probable duration of the disability could be ascertained, and required [claimant] to submit to an examination by a physician of its selection to determine that question. If there had been no injury there would have been no examination, and if there had been no examination there would have been no burn. The burn resulted in the examination which the law authorized [respondent] to require to be made to ascertain whether [claimant] was entitled to further compensation for the injury ***." 317 Ill. 302, 306-07.

Similarly, in *Kivish v. Industrial Com.* (1924), 312 Ill. 311, respondent's insurance company refused to compensate claimant for a work-related injury unless he underwent hospital treatment. While in the hospital, claimant contracted influenza and subsequently died. In holding that claimant's death was caused by his original injury, this court reasoned:

> "[I]t is not possible to determine definitely and absolutely whether the injuries received by him were the proximate cause of his death. Two things are certain: one, that he was severely injured in the line of his employment and that he never recovered from those injuries; and the other, that he went to the hospital for treatment in compliance with the demands of the insurance company which was paying the compensation due the injured employee from his employer. We have held that while the

employee must submit to proper treatment at the request of the employer or forfeit his right to compensation, the employer is, on the other hand, liable for the consequences of a surgical operation to which the injured employee submits in compliance with the employer's demand. (*Mt. Olive Coal Co. v. Industrial Com.*, 295 Ill. 429; *Joliet Motor Co. v. Industrial Board*, 280 id. 148.)" 312 Ill. 311, 316-17.

In the instant case, claimant voluntarily submitted to treatment by a physician of her choice. Where such treatment results in a disability unrelated to an injury sustained during employment, it would be unjust to hold the respondent liable. *Cf. Collier v. Wagner Castings Co.* (1980), 81 Ill. 2d 229, 238 (the likelihood that plaintiff's chosen doctor would inflict emotional distress is plaintiff's risk, not the employer's).

For these reasons, we do not find that respondent is liable to claimant for continuing temporary total compensation. Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

I believe that the determination that the September 11 injury did not cause claimant's later symptoms is against the manifest weight of the evidence and contrary to law. I would reverse and remand to the Industrial Commission for computation of disability benefits.

I disagree first with the majority's conclusion that claimant's symptoms prior to her surgery in December 1979 were due to a congenital condition of the sesamoid bones rather than to an injury suffered at work. In view of the uncontradicted evidence that Miss Zick felt pain in that area after the two accidents at work but felt none before, combined with Dr. Smith's testimony that the congenital deformity alluded to by Drs. Fischer and Meszaros could not cause pain by itself, I find it difficult to escape the conclusion that the accidents caused the pain. Drs. Fis-

cher and Meszaros, on whose testimony the Industrial Commission relied, merely pointed out that there was no fracture of the sesamoid bones. The fact remains that claimant felt pain severe enough to induce her to undergo two operations in 1979. The absence of a fracture does not mean that there was no pain. Discomfort can be caused by a wide variety of things other than a bone fracture; Dr. Fischer in fact attributed the pain to an entrapment of the medial plantar nerve in the great toe, and stated in answer to a question as to whether there was any relation between the September 1979 accidents and her condition following the later operations, "I have to say that it all started in September, of course. I mean that's self evident." As the record reveals no testimony that the congenital condition *alone* could have caused pain, a possibility which is by no means self-evident, I would hold any determination that it did to be against the manifest weight of the evidence. See *Brooks v. Industrial Com.* (1979), 78 Ill. 2d 150, 155-56.

I disagree on a more fundamental level, however, with the majority's holding that even if claimant's current disability was caused by an operation induced by work-related pain, she cannot recover for it if the choice of doctors was her own. This stark limitation is a departure from our workers' compensation statute (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) and has no precedent in our common law.

Professor Larson, in his treatise on workmen's compensation, notes that it is "now uniformly held that aggravation of the primary injury by medical or surgical treatment is compensable" (1 A. Larson, Workmen's Compensation sec. 13.21, at 3—384 (1978)) and notes, citing an Illinois case (*Duvardo v. Moore* (1951), 343 Ill. App. 304), that this maxim is often used to support holdings that a claimant cannot sue in tort for malpractice because the workmen's compensation remedy is exclusive (1 A. Larson, Workmen's Compensation sec. 13.21, at 3—389 (1978)).

Claimants have recovered under workers' compensation even where the "medical treatment" consisted of the claimant's own application of home remedies (*Tierney v. Independent Warehouse Co.* (1962), 16 A.D.2d 844, 227 N.Y.S.2d 548) or of his submission to the advice or physical treatment of a co-employee who was not a doctor (*Fishman v. S.W. Layton, Inc.* (1954), 284 A.D. 165, 130 N.Y.S.2d 656 (advice); *State ex rel. Adriatic Mining Co. v. District Court* (1917), 137 Minn. 435, 163 N.W. 755 (treatment); *Cline v. Studebaker Corp.* (1915), 189 Mich. 514, 155 N.W. 519 (treatment)), on the theory that the supposed remedy would not have been resorted to had it not been for the pain caused by the original work-related injury. According to Larson, it is only where the claimant knowingly chooses to be treated by a charlatan rather than a medical doctor that a break in the chain of compensable consequences should be found. See 1 A. Larson, Workmen's Compensation sec. 13.21, at 3—395 (1978).

The cases in Illinois are not to the contrary. This court uses a "but-for" test to determine whether an initial work-related injury causes a subsequent injury for which compensation is sought. (*International Harvester Co. v. Industrial Com.* (1970), 46 Ill. 2d 238, 245.) The *International Harvester* decision, in announcing this rule, noted that "[c]lear illustrations of this chain of causation relationship are cases where a second injury occurs due to treatment for the first" (46 Ill. 2d 238, 245). This strong observation formed the holding in several cases, decided both before and after *International Harvester.* (See *Brooks v. Industrial Com.* (1979), 78 Ill. 2d 150; *Shell Oil Co. v. Industrial Com.* (1954), 2 Ill. 2d 590; *Huntoon v. Pritchard* (1939), 371 Ill. 36; *Lincoln Park Coal & Brick Co. v. Industrial Com.* (1925), 317 Ill. 302; *Kivish v. Industrial Com.* (1924), 312 Ill. 311.) The claimant in *Brooks* was employed by a hospital but sought treatment from doctors at another hospital, apparently on her own initiative; that did not prevent this court from ruling an injury resulting from

such treatment compensable. It is unclear from the opinion in *Huntoon* who selected the doctor, while in *Shell Oil* one but not both of the doctors involved had been selected by the employer. Yet neither of those decisions attached any significance to whose doctor was involved or whose idea it was that the claimant consult him. Only in *Lincoln Park Coal* and *Kivish* was an issue made of this, the court in the former case observing:

> "[Respondent] refused to pay further compensation until the nature, extent and probable duration of the disability could be ascertained, and required [claimant] to submit to an examination by a physician of its own selection to determine that question. If there had been no injury there would have been no examination, and if there had been no examination there would have been no burn." (317 Ill. 2d 302, 306.)

However, nothing in *Lincoln Park Coal* or *Kivish* states or even suggests that the but-for connection found in those cases would not exist where the employer did not provide or recommend a doctor or condition further payment of benefits on visiting such a doctor. The later cases I have cited did not interpret *Lincoln Park Coal* or *Kivish* as being so limited. To follow those two decisions as narrowly as the majority does here, with no further discussion of their rationale, is to make the unrealistic assumption that injured employees do not voluntarily consult doctors of their own choice without some prodding from their employers.

In this case the claimant made a natural and understandable response to pain in her foot: she consulted several licensed medical doctors of her choice, as it was her statutory right to do (Ill. Rev. Stat. 1979, ch. 48, par. 138.8(a)), and agreed to surgery by one of them. As long as the pain was initially related to her work, what difference does it make who selected the doctors? The risk of mistreatment, though slight, is present whenever one consults a doctor. The majority opinion is likely to result in employers being less willing to recommend doctors to their injured employees for fear that their recommendation will

lead to liability for further benefits in case such mistreatment occurs. Some employees may be unfamiliar with the medical community in their city and may therefore be dependent on such a recommendation for prompt relief. I feel that the law should encourage employers to be solicitous with regard to the health of their employees, rather than discouraging such concern as the majority has done here. I therefore dissent.