2021 IL App (5th) 200302WC-U
No. 5-20-0302WC
Order filed September 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed by Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| STEVIE LEWIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant and Cross-Appellee, | ) | Jackson County. |
| | ) | |
| | ) | |
| v. | ) | No. 20-MR-14 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al*. | ) | |
| | ) | Honorable |
| (Southern Illinois Healthcare, d/b/a Memorial | ) | Michael A. Fiello, |
| Hospital of Carbondale, Appellee and Cross-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm both the Illinois Workers' Compensation Commission's finding that claimant sustained a compensable work-related accident on May 2, 2014, and denial of reimbursement for the use of the MR Spectroscopy. We reverse the Illinois Workers' Compensation Commission's finding as to the denial of reimbursement for claimant's three shoulder surgeries as against the manifest weight of the evidence and remand for a determination of associated TTD benefits.

1

¶ 2    Claimant, Stevie Lewis, a certified nursing assistant (CNA), filed two applications for adjustment of claim against her employer, Southern Illinois Healthcare (SIH), pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2012)), seeking benefits for separate injuries she sustained while working as a CNA for SIH on May 13, 2013 (13 WC 23310) and May 2, 2014 (14 WC 22576). Both of claimant's applications sought benefits for injuries she sustained to the "MAW," presumably man as a whole, on each of the alleged accident dates.

¶ 3    Both claims were consolidated for hearing, pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2018)), before the arbitrator on January 8, 2019. SIH stipulated that claimant had sustained a work-related accident on May 13, 2013, which resulted in injuries to her lower back and left leg, but SIH disputed claimant had sustained a work-related accident on May 2, 2014. The issues in dispute regarding both cases included temporary total disability (TTD), causal relationship, and the reasonableness and necessity of both past and prospective medical treatment.

¶ 4    On February 22, 2019, the arbitrator issued separate decisions. With respect to claimant's first claim (13 WC 23310), which involved the undisputed work injury, the arbitrator ordered SIH to pay all medical services provided to claimant and related TTD benefits.

¶ 5    With respect to claimant's second claim (14 WC 22576), the arbitrator found that claimant had sustained an accident that arose out of and in the course of her employment. The arbitrator further found that claimant's lumbar condition was causally related to the May 2, 2014, accident and ordered SIH to pay all reasonable and necessary medical services. The arbitrator further awarded prospective medical services (including lumbar fusion surgery) and related TTD benefits. However, the arbitrator denied benefits for certain past medical treatment as not reasonable and necessary, namely, 15 of 17 epidural and subcutaneous steroid injections and the magnetic resonance imaging-spectroscopy (MR Spectroscopy). The arbitrator also found that claimant

2

failed to prove her shoulder condition was causally related to the May 2, 2014, work accident. For that reason, the arbitrator denied benefits for claimant's three shoulder surgeries and related TTD benefits.

¶ 6 Claimant and SIH each filed a petition for review before the Illinois Workers' Compensation Commission (Commission), limiting review of the arbitrator's decision to the second claim (14 WC 22576). The Commission, with one commissioner dissenting, issued a decision modifying the arbitrator's decision on January 5, 2020. The Commission reversed the arbitrator's finding that claimant's current condition of ill-being related to her lumbar spine was causally connected to the May 2, 2014, accident. Thus, the Commission vacated the arbitrator's award of prospective medical services for the lumbar fusion surgery and lessened the period of TTD benefits from 8 3/7 weeks to 8 weeks, commencing May 6, 2014, to June 30, 2014. In adopting the arbitrator's finding that claimant's avascular necrosis of both shoulders was not causally connected, the Commission affirmed the arbitrator's denial of TTD and medical benefits. The Commission affirmed the arbitrator's decision in all other respects and remanded the matter to the arbitrator for further proceedings consistent with its decision pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

¶ 7 On January 17, 2020, claimant filed a petition for judicial review in the circuit court of Jackson County. Shortly thereafter, SIH filed a cross-appeal on January 29, 2020. The court subsequently entered an order affirming the Commission's decision on September 15, 2020. On September 22, 2020, claimant filed a timely notice of appeal, and SIH filed a cross-appeal the next day.

¶ 8 On appeal, claimant argues that the Commission erred in denying her TTD benefits and reimbursement for three surgeries related to her bilateral shoulder condition. Claimant also argues

3

that the Commission's decision to deny her reimbursement for the diagnostic test using an MR Spectroscopy was against the manifest weight of the evidence. In its cross-appeal, SIH argues that the Commission's finding that claimant sustained an accident arising out of and in the course of her employment on May 2, 2014, is against the manifest weight of the evidence.

¶ 9    For the reasons set forth below, we find that the Commission's finding that claimant sustained an accident arising out of and in the course of her employment on May 2, 2014, and its denial of reimbursement for the use of the MR Spectroscopy, were not against the manifest weight of the evidence. However, we also find that the Commission's denial of reimbursement for claimant's three shoulder surgeries was against the manifest weight of the evidence. Accordingly, we affirm in part and reverse in part the judgment of the circuit court, reverse in part the Commission's decision, and remand this case to the Commission for further proceedings.

¶ 10                                    I. Background

¶ 11    The following factual recitation is taken from the transcript of the consolidated arbitration hearing held on January 8, 2019, the evidence adduced at that hearing, and the decisions that followed. Although this appeal arises from claimant's second claim (14 WC 22576) pertaining to the alleged May 2, 2014, accident, we have recited facts relating to her first claim (13 WC 23310) as necessary to provide a framework of the issues and analysis presented in this appeal.

¶ 12    Prior to the start of the consolidated arbitration hearing, SIH stipulated that claimant had sustained a work-related accident on May 13, 2013, but disputed that claimant had sustained a work-related accident on May 2, 2014. In addition, the parties stipulated to the admission of 39 exhibits (containing medical bills, treatment records, and 10 deposition transcripts of treating physicians and retained medical experts); that SIH had a policy of accommodating light-duty work for employees with workers' compensation claims; claimant had voluntarily resigned her

4

employment with SIH on September 1, 2014; and that the job duties of a CNA at SIH were the same or substantially similar to the physical requirements of claimant's nursing school clinicals.

¶ 13        A. Claimant's May 13, 2013, Accident and Subsequent Treatment

¶ 14    The consolidated arbitration hearing resulted in the following findings as to the undisputed May 13, 2013, accident. Claimant was employed by SIH as a CNA performing total patient care, such as bathing, feeding, and assisting with bathroom and toileting needs. Prior to the accident, she was in excellent health with no prior back or shoulder injuries or issues.

¶ 15    On May 13, 2013, claimant was assisting another CNA in lifting and repositioning a patient in a chair. When claimant attempted to lift the patient, she felt a "jolting pain" in her lower back. Claimant eventually sought medical treatment from Dr. James Alexander, her family physician. Dr. Alexander diagnosed claimant with a lumbar sprain, administered an epidural steroid injection into her left hip, and ordered claimant to take off work on May 23, 2013. He also ordered a magnetic resonance imaging (MRI) scan, which revealed a central bulging of the L5-S1 disc with a mild encroachment on the ventral thecal sac.

¶ 16    In June 2013, on referral from Dr. Alexander, claimant saw Dr. Jon Taveau, a neurosurgeon. Dr. Taveau examined claimant and ordered computed tomography (CT) and MRI scans, which confirmed a disc herniation at L5-S1. Claimant initially underwent conservative treatment, which included medication and physical therapy, but Dr. Taveau subsequently recommended surgery when claimant's condition gradually worsened.

¶ 17    In July 2013, claimant returned to Dr. Alexander's office on three occasions, July 2, 2013, July 11, 2013, and July 22, 2013, and was seen each time by a nurse practitioner. On July 2, 2013, claimant received a steroid injection for increasing pain in her low back. At the follow-up visit on July 11, 2013, claimant reported that she had some improvement from the prior injection but felt

back spasms after a physical therapy session. On July 22, 2013, claimant received an injection of pain medication for worsening back pain and bilateral hip pain.

¶ 18　　On August 5, 2013, Dr. Taveau performed low back surgery consisting of a L5 laminectomy and L5-S1 discectomy. Claimant reported to Dr. Taveau 44 days postsurgery for a follow-up visit on September 18, 2013. Dr. Taveau later released claimant to return to work without restrictions on April 11, 2014, at which time claimant returned to work and began working 12-hour shifts three times per week.

¶ 19　　　　　　　　B. Claimant's May 2, 2014, Accident and Subsequent Treatment

¶ 20　　At the consolidated arbitration hearing, claimant testified to the events surrounding the disputed May 2, 2014, accident. Claimant was working her last 12-hour shift that week providing care to nine patients, four of whom were "total lift" patients. Claimant explained that "total lift" patients, who needed help with virtually everything (*e.g.*, going to the toilet, bathing, etc.), required the assistance of more than one nurse, and the other five patients also required a significant amount of care. Claimant testified that during her lunch break, she experienced centralized cold and tingling sensations in her low back, near the belt line to her buttocks, which radiated into her hips and legs on both sides. According to claimant, she had not experienced right-sided hip and leg pain with the prior injury. Claimant reported the accident to SIH that same day and completed an accident report in which she described assisting four out of nine patients, each requiring "total lifts/care," and reported back pain due to "activity and heavy lifting." Later that same day, claimant saw Dr. Austin on SIH's referral, who noted that claimant "does not feel that she has re-injured back but just took on too much work too fast." Dr. Austin referred claimant to Dr. Alexander.

¶ 21　　On May 6, 2014, claimant saw Dr. Alexander, who noted that claimant reported working three 12-hour shifts the previous week and experiencing a burning sensation in her back on April

6

30, 2014, and May 1, 2014, followed by a sudden onset of low back pain while at work on May 2, 2014. Claimant reported no radiation of pain into the lower extremities. Dr. Alexander diagnosed claimant with a lumbar strain and authorized her to take off work.

¶ 22     On May 15, 2014, claimant returned to Dr. Alexander for a follow-up visit. According to the treatment record, claimant reported continuing low back pain but with radicular pain into the right lower extremity. The record also documented that claimant complained of "TINGLING IN LOWER RIGHT LEG, FEELS LIKE SOMEONE 'PUNCHED' HER IN THE RIGHT BUTTOCK. WORSE THAN LAST VISIT." (Emphasis in original.) Because claimant's symptoms had worsened, Dr. Alexander ordered an MRI scan of the lumbar spine on May 16, 2014, which revealed evidence of the previous laminectomy at L5-S1, scar tissue possibly affecting the descending S1 nerve roots, but no recurrent disc protrusion.

¶ 23     On May 19, 2014, claimant saw Dr. Taveau and provided a history of symptoms of low back pain and right lower extremity radicular pain following a work-related injury on May 2, 2014. Dr. Taveau reviewed the May 16, 2014, MRI and, contrary to the radiologist's report, noted a recurrent disc herniation at L5-S1, paracentral right, impinging on the right L5 and descending sacral nerve roots. Dr. Taveau recommended conservative treatment including steroid injections but further observed that an L5-S1 fusion might be required. He agreed with Dr. Alexander that claimant should remain off work.

¶ 24     On May 28, 2014, claimant returned to Dr. Taveau. Dr. Taveau noted that claimant had recently visited the emergency room complaining of an exacerbation of her symptoms. He further noted that the flexion and extension x-rays showed no evidence of instability. After Dr. Taveau reaffirmed his opinion that claimant had sustained a recurrent disc herniation at L5-S1, he ordered claimant off work, although he released her to attend school, and recommended low impact

7

exercises, such as swimming. On June 6, 2014, an electromyography (EMG) revealed results consistent with right L5-S1 radiculopathy. Claimant later received epidural steroid injections on June 9, 2014, October 27, 2014, and November 14, 2014. A short time later, Dr. Taveau relocated his medical practice and referred claimant to Dr. Matthew Gornet, an orthopedic surgeon.

¶ 25    On June 26, 2014, claimant presented to Dr. Brent Newell, a pain management specialist. Claimant complained of both low back and leg pain, with pain greater in the right than left side. Dr. Newell's notes reflect a sudden onset of injury in the context of lifting a heavy patient. Dr. Newell reviewed the May 16, 2014, MRI and, consistent with the radiologist's report, opined that there was enhancing scar tissue in the L5-S1 disc affecting the S1 nerve roots and no evidence of recurrent disc herniation. Dr. Newell subsequently administered bilateral epidural steroid injections at L5-S1 on July 2, 2014, and September 19, 2014.

¶ 26    From August 18, 2014, through October 30, 2014, claimant received physical therapy. When initially evaluated by the physical therapist on August 18, 2014, claimant complained of low back and leg pain, right greater than left, "after lifting a 400 [pound] patient at work." Claimant also reported receiving two steroid injections that provided some relief from radicular symptoms. On October 30, 2014, the physical therapist noted claimant's complaints were in the right L4 dermatome and intermittently in the right L5-S1 dermatome.

¶ 27    Claimant next testified regarding her voluntary resignation from employment at SIH. Even though SIH was accommodating her light-duty work restrictions, claimant explained that she resigned from her employment, effective September 1, 2014, because she had been accepted into a licensed practical nursing program at a local college and did not believe she could handle the physical and mental stress of working and attending school.

¶ 28   On October 30, 2014, claimant underwent another MRI of her lumbar spine, which revealed postoperative changes at L5-S1, decreased contrast enhancing epidural granulation and fibrosis compared to the prior exam, and minimal left L4-L5 and mild-moderate left L5-S1 foraminal stenosis. However, the MRI revealed no recurrent or residual disc herniation or significant central spinal canal stenosis.

¶ 29   On November 20, 2014, per Dr. Taveau's referral, claimant presented to Dr. Gornet. Claimant informed Dr. Gornet of both work-related accidents. With regard to the May 2, 2014, accident, claimant reported that "she had a second injury lifting a patient with a co-worker and developed increasing pain." Claimant complained of low back and right leg pain with occasional left-sided symptoms. Claimant also filled out a patient information form stating that she was "seeking Dr. Gornet for best treatment options to return to normal living!"

¶ 30   Dr. Gornet reviewed claimant's prior MRI scans. He opined that both scans on May 16, 2014, and October 30, 2014, revealed large annular tears at L5-S1. Dr. Gornet recommended that claimant undergo a CT myelogram and a third MRI. Dr. Gornet imposed work and activity restrictions and recommended claimant undergo an anterior fusion surgery at L5-S1, although he cautioned claimant that her right leg pain may persist even with surgery. Dr. Gornet opined that claimant had sustained a disc injury as a result of the work-related accident on May 13, 2013, and that her condition was aggravated by the second work-related accident on May 2, 2014. He noted that the initial surgery performed on claimant, which included the discectomy and removal of part of the structure of the spine, weakened the structure. According to Dr. Gornet, the weakening of the structure could result in pain and symptoms. It was his belief that "her current symptoms and requirement for treatment are causally connected to her work-related injuries as described and both play a role in her current need for treatment."

9

¶ 31    On December 5, 2014, a third MRI of claimant's lumbar spine revealed the prior disc surgery at L5-S1 and moderate degenerative disc disease at L5-S1 with no evidence of recurrent disc herniation. Dr. Gornet's notes following a review of the MRI demonstrated, with the exception of L5-S1, that all discs appeared healthy. Dr. Gornet did not specify the abnormalities present at L5-S1.

¶ 32                              1. Deposition Testimony of Dr. Taveau

¶ 33    Dr. Taveau testified to the following in a deposition on December 15, 2014. Dr. Taveau is a board-certified neurosurgeon. Following claimant's work-related injury on May 13, 2013, Dr. Taveau initially provided conservative treatment. At that time, claimant complained of increased pain, numbness, and tingling in the left leg extending into her left little toe. Dr. Taveau later performed disc surgery at L5-S1 on August 5, 2013. Dr. Taveau recounted his medical findings and opinions contained in the various treatment notes, including his note from claimant's last visit on May 28, 2014. Dr. Taveau reaffirmed his opinion that claimant's disc herniation was related to the May 13, 2013, accident.

¶ 34    Regarding claimant's treatment following her May 2, 2014, accident, Dr. Taveau testified that claimant had radicular findings on the right side that were not present after the May 13, 2013, accident. Because claimant's previous findings were limited to her left side, Dr. Taveau believed that the right-sided symptoms suggested a new condition and not just an exacerbation of the old condition.

¶ 35                              2. First Independent Medical Evaluation

¶ 36    Dr. Andrew Zelby's independent medical evaluation (IME) report, which was admitted by stipulation at the arbitration hearing, reveals the following. At SIH's request, claimant saw Dr. Zelby, a neurosurgeon, for an IME on January 14, 2015. In preparation for claimant's IME, Dr.

Zelby reviewed medical records and diagnostic studies associated with claimant's work-related accidents. Dr. Zelby opined that the diagnostic studies performed after the May 13, 2013, accident revealed a disc protrusion at L5-S1, but he opined that there was no basis for claimant undergoing "urgent surgery." Dr. Zelby noted that claimant underwent an L5 laminectomy and L5-S1 discectomy in August 2013 and returned to full-duty work on April 17, 2014.

¶ 37    In regard to the diagnostic studies performed after the May 2, 2014, accident, Dr. Zelby, consistent with the radiologist's opinion but contrary to Dr. Taveau's opinion, opined that there was no evidence of a recurrent disc herniation. Additionally, regarding the presence of an annular tear following surgery, he opined that it was meaningless and did not provide a basis to consider further surgery. Rather, Dr. Zelby reported essentially normal neurologic and spinal findings on examination. He found no objective findings to explain the persistence and severity of claimant's symptoms. Dr. Zelby also observed significant symptom magnification with 4 out of 5 positive Waddell signs. He concluded that there was no medical basis for claimant to undergo a fusion at L5-S1. He also concluded that claimant had reached maximum medical improvement (MMI) as of January 2014, or, at the latest, by February 2014. In his report, Dr. Zelby specified that "claimant is medically qualified to pursue most if not all of her regular job duties, and there is no medical evidence to suggest that she is not safely qualified to pursue at least a medium-heavy physical labor, lifting at least 50-60 pounds occasionally and 25-30 pounds frequently."

¶ 38                                3. Claimant's 2015 Treatment

¶ 39    On January 19, 2015, claimant presented to Dr. Alexander complaining of low back pain. At that time, Dr. Alexander's physician assistant noted that claimant had recently taken the train to Chicago, which worsened the pain in her low back, legs, and feet. Dr. Alexander's physician assistant administered a steroid injection.

11

¶ 40    On March 19, 2015, claimant returned to Dr. Gornet. Dr. Gornet ordered and claimant underwent an MRI scan of the lumbar spine, a lumbar spine myelogram and CT scan post myelogram. The MRI revealed postsurgical changes involving the posterior paraspinous soft tissues and ventral epidural space consistent with postsurgical granulation tissue at the L5-S1 level, no evidence of a recurrent L5-S1 disc herniation, mild to specification with diffuse annular disc bulge, no central canal stenosis, and minimal bilateral neural foraminal exit stenosis. The MRI revealed no evidence of other significant disc desiccation, disc profile abnormality, central canal stenosis, or neural foraminal exit stenosis throughout the remainder of the lumbar spine.

¶ 41    The CT scan of the lumbar spine post myelogram showed normal alignment of the lumbar spine. There was mild disc desiccation with diffuse annular disc bulge, no central canal stenosis, and minimal bilateral neural foraminal exit stenosis. It was further noted there was no other significant disc profile abnormality, central canal stenosis, or neural foraminal exit stenosis throughout the remainder of the lumbar spine and no facet arthropathy throughout the lumbar spine. The radiologist's report did not address the presence of a recurrent disc herniation.

¶ 42    Dr. Gornet also reviewed Dr. Zelby's IME report. Although Dr. Gornet noted some concerns about symptom magnification, he explained that the diagnostic studies clearly, and objectively, show a large annular tear at L5-S1. He renewed his recommendation that claimant undergo an anterior lumbar fusion at L5-S1. However, Dr. Gornet also expressed concern that claimant was relying on narcotic pain medications. For that reason, Dr. Gornet expressed that no further treatment would be provided unless she could be weaned off the narcotics. If not, he determined that she would be at MMI. However, if claimant could demonstrate that she was weaned off all narcotics and a reasonable candidate for intervention, Dr. Gornet would consider performing an anterior lumbar fusion at L5-S1.

¶ 43 On April 13, 2015, claimant presented to Dr. Mark Fleming, a neurosurgeon, but was evaluated by Michael Bryant, a physician assistant. At that time, claimant complained of low back and right leg pain and advised that Dr. Gornet had recommended lumbar fusion surgery. Upon reviewing the December 2014 MRI scan, Physician Assistant Bryant concluded that there was no evidence of a recurrent disc herniation. Additionally, Physician Assistant Bryant reviewed lumbar spine x-rays finding no evidence of spinal instability.

¶ 44 On April 21, 2015, Physician Assistant Bryant added an addendum to the April 13, 2015, office note, stating that he and Dr. Fleming reviewed the new imaging studies in comparison to the older imaging studies, stating that "there is not a recurrent disc herniation at the L5-S1 level. There is no significant stenosis at L4-5 or L5-S1. *** Dr. Fleming agreed to see her in clinic if she desires." Claimant was then referred to Dr. Gerson Criste, a board-certified pain management specialist, for evaluation and possible treatment using dorsal column stimulator.

¶ 45 On April 29, 2015, claimant presented to Dr. Criste, who noted there were differing medical opinions as to claimant's need for fusion surgery. Claimant declined the spinal cord stimulator implant procedure and, instead, requested an epidural steroid injection. Because claimant continued to complain of radicular right leg pain, Dr. Criste administered epidural steroid injections on May 4, 2015, and May 19, 2015. On May 27, 2015, claimant reported that the injections had relieved her symptoms, and "she has been able to stop her pain pills." She also agreed to schedule another course of physical therapy.

¶ 46 In August 2015, claimant continued with physical therapy and resumed nursing school. Claimant reported no bilateral lower extremity radiculopathy on August 24, 2015. At that time, she rated her low back pain, on a scale of 1/10, as currently at 0/10, and at 4/10 at its worst.

¶ 47     On August 27, 2015, claimant reported to the physical therapist that she was feeling much better and had no pain in her low back or leg region. On September 17, 2015, claimant reported running at regular intervals and, on September 22, 2015, reported "abolished radicular symptoms" and improved activity tolerance.

¶ 48     On October 5, 2015, claimant returned to Dr. Gornet. She reported that she was no longer taking narcotics. Dr. Gornet noted that claimant "has done amazing things," such as getting off narcotics despite obvious pain. Dr. Gornet opined claimant had discogenic pain due to the annular tear and a previous surgery at L5-S1. She was discharged from physical therapy on October 19, 2015.

¶ 49                              4. Deposition Testimony of Dr. Gornet

¶ 50     Dr. Gornet testified to the following in a deposition on September 21, 2015. Dr. Gornet expressed that claimant had more of a structural problem at L5-S1 because of the prior discectomy and laminectomy, which caused a destabilization of her spine at L5-S1 and an annular tear. Dr. Gornet opined that the only way to stabilize claimant's spine was to perform a fusion surgery. Dr. Gornet also reaffirmed his opinion that claimant's low back condition was causally connected to her work-related injury.

¶ 51     On cross-examination, Dr. Gornet was questioned about Waddell findings. He responded that claimant's markings on a pain diagram of her areas of complaint were consistent with the area of surgery at the L5 and SI nerve roots. When questioned about Dr. Taveau's opinion that claimant had a recurrent disc herniation at L5-S1, Dr. Gornet testified that claimant had more of a structural problem at L5-S1 due to the prior discectomy and laminectomy, which caused a destabilization of her spine at L5-S1 and an annular tear. Dr. Gornet reiterated his opinion that the only way to stabilize the spine was to perform a fusion surgery.

¶ 52                    5. First Deposition Testimony of Dr. Zelby

¶ 53    Dr. Zelby testified in a deposition on December 2, 2015. Dr. Zelby first identified his January 14, 2015, IME report and recalled his medical findings and opinions. Dr. Zelby testified that there was no medical indication of instability revealed by claimant's flexion and extension x-rays. Therefore, Dr. Zelby concluded that there was no medical basis for performing an L5-S1 fusion surgery.

¶ 54                         6. Claimant's 2016 Treatment

¶ 55    On January 4, 2016, claimant again saw Dr. Gornet for a follow-up visit. Dr. Gornet's report reflects that claimant was in nursing school but with restrictions. Dr. Gornet continued to diagnosis discogenic pain at L5-S1. He again attributed claimant's condition to the first accident and the associated decompression surgery and opined that the surgery caused destabilization of that segment of the spine. Dr. Gornet opined that anterior fusion surgery at L5-S1 would be necessary if claimant's symptoms continued. He ordered an "MRI Spectroscopy"[1] scan at L3-L4, L4-L5, and L5-S1, which was administered on March 15, 2016.

¶ 56    On March 24, 2016, claimant returned to Dr. Gornet. Dr. Gornet noted the MR Spectroscopy was positive for the presence of painful chemicals at L5-S1 and L4-L5. Dr. Gornet described his examination as non-focal, and he recommended claimant proceed with the anterior fusion surgery at L5-S1.

¶ 57    Five days later, on March 29, 2016, claimant contacted Dr. Criste's office reporting that her leg pain was returning, and she wanted another injection. Dr. Criste subsequently administered an epidural steroid injection at L5 on the right side of claimant's body on April 7, 2016.

---

[1]Although the parties' briefs and common law record contain numerous references to this diagnostic test as an "MRI Spectroscopy," or magnetic resonance imaging spectroscopy, the related medical bill references this test as an "MR Spectroscopy." For the sake of consistency and accuracy, we will adopt the term used in the medical bill.

¶ 58                    7. First Utilization Review Report

¶ 59    On April 11, 2016, at SIH's direction, Dr. Michael Treister, an orthopedic surgeon and independent medical review specialist, performed a "utilization review" of Dr. Gornet's March 24, 2016, recommendation that claimant undergo a L5-S1 anterior lumbar fusion surgery. Dr. Treister believed that Dr. Gornet's findings from claimant's November 20, 2014, examination correlated with nerve root pressure at the L4-L5 and not the L5-S1 level. According to his report, Dr. Treister reviewed medical records, including Dr. Zelby's IME report, and made two failed attempts to speak to Dr. Gornet. Dr. Treister did not meet with claimant. Based, in part, on the lack of physical examination findings in Dr. Gornet's records of October 5, 2015, January 4, 2016, and March 24, 2016, Dr. Treister opined that an anterior L5-S1 fusion was not medically reasonable and necessary. Dr. Treister also noted that Dr. Gornet did not document any subjective complaints to support the administration of epidural steroid injections.

¶ 60                      8. 2016 Steroid Injections

¶ 61    Claimant's 2016 medical records reveal that Dr. Alexander administered epidural steroid injections for claimant on January 25, 2016, April 5, 2016, September 27, 2016, October 14, 2016, and December 6, 2016. In addition, Dr. Criste administered epidural steroid injections on April 6, 2016, July 6, 2016, and July 21, 2016. Claimant also continued to see Dr. Gornet throughout 2016, which demonstrate on several occasions, specifically on June 27, 2016, September 29, 2016, and January 5, 2017, that claimant's condition remained essentially the same.

¶ 62                   9. Deposition Testimony of Dr. Treister

¶ 63    Dr. Treister, board certified in general orthopedic surgery and hand surgery, testified to the following in a deposition on December 19, 2016. Dr. Treister certifies approximately 80 to 90% of all procedures that he reviews. Dr. Treister reaffirmed the opinions expressed in his April 11,

16

2016, utilization review report, including that Dr. Gornet's findings from claimant's November 20, 2014, examination correlated with nerve root pressure at the L4-L5 and not the L5-S1 level. Dr. Treister noted a lack of a description of claimant's subjective complaints and any findings on examination contained in Dr. Gornet's records following claimant's November 20, 2014, examination. Dr. Treister also noted Dr. Zelby's Waddell findings and found it highly unlikely that claimant's symptoms actually worsened after she received one of the epidural steroid injections. Dr. Treister elaborated that an epidural steroid injection should reduce discomfort for a period of time. Furthermore, claimant had been treated for anxiety and depression, and Dr. Treister believed that such contraindications should be fully evaluated before proceeding to surgery. Dr. Treister elaborated that customary contraindications to spinal surgery and, particularly revision spinal surgery, include a lack of agreement between subjective complaints, objective physical findings, and radiologic, pathologic localization. Dr. Treister also opined that an MR Spectroscopy, commonly used to evaluate brain tumor patients, was not generally used to evaluate spinal conditions, and a positive finding at L5-S1 was not supportive of fusion surgery. Dr. Treister testified that claimant's L5-S1 fusion surgery procedure was not reasonable and necessary.

¶ 64    On cross-examination, Dr. Treister was questioned about the use of an MR Spectroscopy to measure chemical content of a disc. Dr. Treister testified that he was only aware of Dr. Gornet utilizing this type of testing on a clinical basis. In claimant's case, Dr. Treister observed that the study revealing an abnormal chemical content was not significant, because the disc was previously herniated, which would have an abnormal chemical content due to degenerative disc disease. Additionally, claimant underwent a laminectomy, which would also result in significant changes. Dr. Treister further testified that "the science is not even exact in the uninjured state, so what you

17

could possibly draw from the information of a postoperative case is a total muddle at this point in time. It's not meaningful."

¶ 65                    10. Second Deposition Testimony of Dr. Gornet

¶ 66    Dr. Gornet testified at a second deposition on January 23, 2017. At the start of the deposition, claimant's counsel stated that the arbitrator had issued the dedimus for the primary purpose of allowing claimant to conduct a rebuttal deposition concerning the opinions expressed by Dr. Treister. Dr. Gornet then testified to the following. Dr. Gornet had reviewed Dr. Treister's utilization review report prior to testifying but had not reviewed a transcript of Dr. Treister's December 19, 2016, deposition. Dr. Gornet recounted that claimant showed a clear objective structural problem at L5-S1 with a large annular tear at L5-S1, as shown by the March 19, 2015, MRI. Regarding the L5 nerve root, Dr. Gornet testified it was closer to L5-S1 than L4-L5. He explained that while the L5 nerve root can be irritated by pathology at L4-L5, it can also be irritated by pathology at L5-S1. Dr. Gornet also reviewed the June 6, 2014, EMG study and noted its findings of radiculopathy at L5-S1, which were consistent with his findings. Dr. Gornet testified that he did not record examination findings on every visit unless he observed a change in condition. Specific to claimant, her complaints remained essentially the same during her visits. Dr. Gornet was asked, "Do you believe that the annular tear that you're looking at and you diagnosed in [claimant] was caused by Dr. Taveau's surgery?" Dr. Gornet responded, "No. I believe it was caused by her injury, and I believe it was made symptomatic by her injury."

¶ 67    Regarding claimant's depression, Dr. Gornet testified that patients with an appropriately selected pathology generally respond well to surgery. He specifically noted that claimant was no longer taking narcotics and had a treatable problem. Additionally, Dr. Gornet testified that an MR Spectroscopy, a "validated diagnostic" by the Food and Drug Administration (FDA), was a reliable

18

diagnostic tool to determine whether someone needed treatment. On cross-examination, Dr. Gornet agreed that only three offices in the country used MR Spectroscopy to evaluate spinal patients. Dr. Gornet also agreed that the presence of an annular tear, in and of itself, was not an indication for surgery, but other factors, including, for example, failed conservative treatment, must also be considered.

¶ 68                           11. Claimant's Bilateral Shoulder Complaints

¶ 69    Claimant testified that she began experiencing shoulder symptoms in October 2016, so she first sought treatment with Dr. Alexander on December 6, 2016. Dr. Alexander's office notes reflect that claimant complained of bilateral shoulder pain, primarily in the left shoulder, at which time she was diagnosed with left shoulder bursitis and administered a steroid injection.

¶ 70    On December 27, 2016, claimant returned to Dr. Alexander complaining of left shoulder pain radiating down her arm. Dr. Alexander's physician assistant evaluated claimant and ordered an x-ray of the left shoulder, which later revealed questionable avascular necrosis.

¶ 71    On January 10, 2017, claimant returned to Dr. Alexander and, again, was evaluated by Dr. Alexander's physician assistant. The office note reveals that claimant's chief complaint was right shoulder pain with numbness in her bicep. X-rays and CT scans of both shoulder were ordered. CT scans were conducted on January 12, 2017, which confirmed left shoulder avascular necrosis with an anterior trochlear fracture and prior right shoulder avascular necrosis of the humeral head and minimal subarticular collapse. Claimant was then referred to Dr. George Paletta, an orthopedic surgeon.

¶ 72    On January 18, 2017, claimant presented to Dr. Paletta. At that time, claimant advised Dr. Paletta that she had been previously diagnosed with avascular necrosis in both shoulders and received steroids for her back injury. Dr. Paletta ordered x-rays of both shoulders and reviewed

the January 12, 2017, CT scans, which also revealed avascular necrosis in both shoulders. Dr. Paletta diagnosed claimant with bilateral humeral head avascular necrosis secondary to steroid use.

¶ 73    Dr. Paletta subsequently performed arthroscopic reconstructive surgery of the humeral heads on claimant's left and right shoulders on April 25, 2017, and July 27, 2017, respectively. Dr. Paletta subsequently performed a second right shoulder surgery on November 2, 2017, which consisted of an open repair of the subscapularis. He authorized claimant to be off work from April 25, 2017, through May 1, 2018.

¶ 74                    12. Deposition Testimonies of Dr. Paletta

¶ 75    Dr. Paletta testified in separate depositions on August 18, 2017, and April 25, 2018. In both depositions, Dr. Paletta noted claimant had undergone multiple steroid injections. Dr. Paletta attributed claimant's bilateral avascular necrosis as secondary to steroid use.

¶ 76                    13. Second Independent Medical Evaluation

¶ 77    On April 23, 2018, claimant returned for a second IME conducted by Dr. Zelby. In connection with his evaluation, Dr. Zelby reviewed various documents, including past medical records, diagnostic studies, Dr. Treister's utilization review report, and select pages of the transcript of Dr. Gornet's deposition testimony provided by SIH. According to Dr. Zelby's IME report, claimant provided a "dramatically different history" about her May 2, 2014, injury than what she stated in 2015. Specifically, claimant stated that she had sustained injuries on May 2, 2014, when she and three coworkers were using a "hover mat" to lift a 500-pound patient. She also told Dr. Zelby that she had received 17 epidural steroid injections and had three shoulder surgeries. According to the report, claimant complained of constant pain "in her L5-S1." She also complained of pain, numbness, and tingling in her top right buttock that radiated down the front of her right

20

lower extremity to the tops of all five toes. Claimant noted that she did not experience pain on the backside of her right leg. On the left side, claimant complained of "sciatica pain" in her top left buttock and on the backside of her left thigh halfway down to her knee with no pain in her lower extremity past the knee.

¶ 78    Upon examination, Dr. Zelby observed that claimant's spinal and neurological exam was objectively normal, and he, again, noted the presence of symptom magnification. He opined that numerous steroid injections claimant had received were not medically necessary because claimant did not have a  condition requiring steroid injections. He further opined that the annular tear had no clinical significance, the recommended L5-S1 fusion surgery was not supported by objective evidence, and, contrary to Dr. Gornet's opinion, an MR Spectroscopy in spinal conditions was not reasonable.

¶ 79                          14. Second Deposition Testimony of Dr. Zelby

¶ 80    Dr. Zelby testified in his second deposition on July 9, 2018. Dr. Zelby, reaffirming his opinions expressed in the April 23, 2018, IME report, testified that claimant had no residual recurrent disc issues or findings of radiculopathy. Concerning claimant's statements concerning the May 2, 2014, injury, Dr. Zelby testified that claimant had previously reported that she had just sat down after work and experienced pain, which differed from the subsequent description given on April 23, 2018.

¶ 81    On cross-examination, Dr. Zelby agreed that disc disruption at L5-S1 could cause L5 nerve irritation. In regard to the inconsistent history, Dr. Zelby acknowledged that he did not request that claimant complete a history form describing the events leading up to her injury, nor did he have any knowledge of the history claimant gave to the other medical providers.

¶ 82                    15. Third Deposition Testimony of Dr. Gornet

¶ 83    Dr. Gornet testified at a third deposition on August 13, 2018. At the start of the deposition, claimant's counsel explained that the deposition was in rebuttal to Dr. Zelby's second IME report. Dr. Gornet again testified that claimant's objective findings were clearly verified by various MRI scans and an MR Spectroscopy. Dr. Gornet, again, opined that the objective findings support his recommendation for fusion surgery at L5-S1. Dr. Gornet believed that Dr. Zelby had limited knowledge of the use of MR Spectroscopy. Dr. Gornet also commented that Dr. Zelby would likely be surprised to learn that Dr. Gornet had been involved in discussions with numerous physicians about bringing the technology to Rush Presbyterian Hospital.

¶ 84    On cross-examination, Dr. Gornet was asked whether claimant's multiple steroid injections were related to her avascular necrosis. Dr. Gornet replied that steroid injections are reasonable and necessary generally for treatment of low back pain so long as the patient receives some clinical benefit. Dr. Gornet further replied that the medical research demonstrates that avascular necrosis may develop after only one injection. With that said, Dr. Gornet clarified that he was not offering an opinion to a reasonable degree of medical certainty as it relates to claimant's avascular necrosis.

¶ 85                    16. Second Utilization Review Report

¶ 86    Dr. Treister performed another utilization review on September 21, 2018, regarding the medical reasonableness and necessity of Dr. Gornet's recommendation for fusion surgery and further reviewed the propriety of claimant's steroid injections from 2013 through 2016. Dr. Treister opined that there was no medical basis for a fusion surgery at L5-S1. In regard to the epidural steroid injections, Dr. Treister concluded that the initial injections received on May 23, 2013, July 2, 2013, June 9, 2014, were "more likely than not medically reasonable and necessary"

22

for various reasons. However, the remainder of the injections were not recommended according to the Official Disability Guidelines (ODG) and, thus, not reasonable and necessary. Dr. Treister commented that there was no consideration given to the cumulative effect of the steroid injections, and the ODG are quite specific about the need for documenting symptom relief. Dr. Treister observed that claimant's medical records consistently lacked pre and post injection rational documentation. Dr. Treister opined that claimant's avascular necrosis disease was more likely than not related to the cumulative effect of the steroid injections.

¶ 87                    17. Second Deposition Testimony of Dr. Treister

¶ 88    Three days after issuing his latest utilization review report, Dr. Treister testified at a second deposition on September 24, 2018, where he reaffirmed the opinions expressed in his report. Dr. Treister was not questioned regarding claimant's injections administered before July 2013. Concerning the remainder of the injections, Dr. Treister testified that the first two injections claimant received after the May 2, 2014, accident, which were administered on June 9, 2014, and July 2, 2014, were reasonable and necessary, but all others were not medically reasonable and necessary. Dr. Treister explained that the medical records did not show any objective findings of radicular symptoms, and claimant generally reported no improvement following injections. He also reiterated his opinion that the steroid injections contributed to claimant's avascular necrosis.

¶ 89    During the arbitration hearing, claimant testified that she had continued to live with constant low back pain with radiation into both legs, more on the right than left. She wants to proceed with the fusion surgery recommended by Dr. Gornet. Claimant also has returned to work as an "RN" for a medical facility not associated with SIH but avoids lifting patients without assistance and requests help when needed.

23

¶ 90        18. The Decisions of the Arbitrator, Commission, and Circuit Court

¶ 91    On February 22, 2019, the arbitrator issued separate decisions related to each of claimant's claims. Again, the decision as to the first claim is not in dispute. With respect to claimant's second claim, the arbitrator found that claimant had sustained an accident that arose out of and in the course of her employment, and claimant's lumbar condition was causally related to the May 2, 2014, accident. As such, the arbitrator ordered SIH to pay all reasonable and necessary medical services, as provided in sections 8(a) and 8.2 of the Act (820 ILCS 305/8(a), 8.2 (West 2012)), awarded prospective medical services, which included the lumbar fusion surgery, and awarded TTD benefits of $242.87 per week for 8 3/7 weeks, commencing May 2, 2014, through June 30, 2014, as provided in section 8(b) of the Act (*id.* § 8(b)). The arbitrator, however, determined that certain medical treatments, specifically, the MR Spectroscopy and 15 of the 17 administered epidural and subcutaneous steroid injections, were not reasonable and necessary, thus denying benefits. Additionally, the arbitrator determined that claimant had failed to prove that her shoulder condition was causally related to the May 2, 2014, work accident. For that reason, the arbitrator denied claimant TTD benefits and medical benefits for her bilateral shoulder surgeries.

¶ 92    Following the arbitrator's decision, both claimant and SIH filed a petition for review before the Commission. Both parties limited review of the arbitrator's decision to the second claim, although both parties acknowledged that the facts of the 2013 accident formed the backdrop for the issues in the 2014 claim. Claimant challenged the arbitrator's denial of TTD and medical benefits for her bilateral shoulder surgeries. SIH challenged the arbitrator's findings concerning (1) accident, (2) causation as to claimant's lumbar spine condition, (3) the award of past and prospective medical treatment, and (4) TTD benefits stemming from claimant's lumbar spine condition.

24

¶ 93    On January 5, 2020, the Commission, with one commissioner dissenting, issued a decision modifying the arbitrator's decision. The Commission found that claimant had sustained an accident arising out of and in the course of her employment on May 2, 2014. The Commission found claimant credible, noting that claimant reported the accident to SIH that same day, prepared a written accident report, and presented to Dr. Austin on SIH's referral.

¶ 94    The Commission, however, reversed the arbitrator's finding that claimant's current condition of ill-being related to her lumbar spine was causally connected to the May 2, 2014, accident. Thus, the Commission vacated the arbitrator's award of prospective medical services for the lumbar fusion surgery and lessened the period of TTD benefits from 8 3/7 weeks to 8 weeks, commencing May 6, 2014, to June 30, 2014. In adopting the arbitrator's finding that claimant's avascular necrosis of both shoulders was not causally connected, the Commission affirmed the arbitrator's denial of TTD and medical benefits. The Commission affirmed the arbitrator's decision in all other respects and remanded the matter to the arbitrator for further proceedings consistent with its decision pursuant to *Thomas*, 78 Ill. 2d 327.

¶ 95    In forming its decision, the Commission found it significant that Dr. Taveau had restricted claimant from returning to work on August 19, 2014, but he had not seen claimant since May 28, 2014. The Commission, therefore, found Dr. Taveau's August 19, 2014, opinion not credible. The Commission further relied on the opinions of Dr. Zelby, Dr. Treister, and Dr. Fleming that there was no evidence of a herniated disc or spinal instability on the diagnostic tests. The Commission found the opinions of these three experts to be more persuasive than the opinion of Dr. Gornet. The Commission gave weight to Dr. Treister's testimony that the injections after June 9, 2014, were not recommended according to the ODG, his opinions that the objective findings did not correlate with claimant's subjective complaints, and his determination that the lumbar fusion

surgery was not reasonable and necessary. The Commission also gave weight to Dr. Zelby's opinion that the March 19, 2015, MRI scan of claimant's lumbar spine at L5-S1 and CT scan results confirmed resolution of the stenosis and neural impingement, with no residual issues at any level. The Commission noted that Dr. Zelby's opinion comported with Dr. Fleming's opinion that claimant was not a surgical candidate.

¶ 96    In addition, the Commission stated that the diagnosis of spinal instability was disputed by claimant's other treating practitioners, including Dr. Fleming, Dr. Taveau, and Physician Assistant Bryant. The Commission found Dr. Gornet's reliance on the MR Spectroscopy in forming the basis of his opinion as unreliable. In particular, the Commission expressed that Dr. Gornet's concession, specifically, that only three offices in the country relied on MR Spectroscopy as a procedure for spinal condition, supported Dr. Treister's opinion that the procedure was experimental. Further, the Commission found Dr. Zelby's testimony persuasive where he attested that MR Spectroscopy was not a diagnostic tool used for spinal conditions. Rather, according to Dr. Zelby, it was a procedure used as a predictive value for brain tumor patients. Accordingly, the Commission concluded that claimant had failed to prove that her current condition of ill-being in her lumbar spine was causally related to the work-related accident.

¶ 97    Regarding claimant's bilateral shoulder condition, the Commission similarly found that it was not causally related to the May 2, 2014, accident. The Commission noted that Drs. Paletta and Treister both opined that claimant's avascular necrosis was related to the epidural steroid injections. The Commission agreed with the arbitrator's conclusion that the epidural steroid injections after July 2, 2014, were not medically reasonable and necessary to cure the effects of the May 2, 2014, accident. The Commission then concluded that "the condition caused by unreasonable and unnecessary treatment is not related to the accident."

¶ 98    The dissenting commissioner disagreed with the majority's credibility determinations. For that reason, the dissenting commissioner stated that he would affirm the arbitrator's findings that claimant's condition of ill-being in her lumbar spine was causally related to the May 2, 2014, accident and the award of prospective medical treatment, which included the fusion surgery that had been recommended by Dr. Gornet. In addition, based primarily on Dr. Gornet's testimony regarding the connection between a single epidural steroid injection and the potential development of avascular necrosis, the dissenting commissioner stated that he would reverse the arbitrator's denial of benefits for claimant's three bilateral shoulder surgeries.

¶ 99    On January 17, 2020, claimant filed a petition for judicial review in the circuit court of Jackson County. SIH filed a cross-appeal on January 29, 2020. The court subsequently entered an order affirming the Commission's decision on September 15, 2020. On September 22, 2020, claimant filed a timely notice of appeal, and SIH filed a cross-appeal the next day.

¶ 100                                    II. Analysis

¶ 101   Because SIH challenges on cross-appeal the Commission's threshold finding that claimant proved by a preponderance of the evidence the May 2, 2014, work-related accident, it is logical to first address SIH's challenge before addressing claimant's contentions of error.

¶ 102                            A. SIH's Cross-appeal

¶ 103                            1. May 2, 2014, Accident

¶ 104   SIH argues that the Commission's finding concerning accident is against the manifest weight of the evidence. In support, SIH contends that the Commission failed to consider the conflicting histories of accident provided by claimant coupled by the objective medical evidence. Claimant responds that "the record contains more than sufficient evidence to support the

27

conclusion by the [a]rbitrator, by the Commission, and by the [c]ircuit [c]ourt that an accident occurred at work on [May 2, 2014] when [claimant] hurt her back lifting various patients."

¶ 105 We begin by noting, as demonstrated above, that claimant's briefs contain numerous references to mutual findings made by the arbitrator, the Commission, and the circuit court (occasionally collectively referred to as "the lower bodies," "lower decision makers," or "decision-makers upstream"), in support of claimant's arguments or in opposition to arguments made by SIH. There are other instances in claimant's briefs where claimant provides verbatim quotes from the circuit court's order and misstatements of the conclusions drawn by the circuit court. For instance, contrary to claimant's argument concerning this particular issue, as stated above, the circuit court drew no conclusion that an "accident occurred at work on [May 2, 2014]." Instead, in compliance with that court's lesser standard of review, the court merely ruled that the Commission's conclusion that such accident occurred was not against the manifest weight of the evidence. Thus, by adopting and affirming the arbitrator's decision, it was the Commission that determined that a work-related accident occurred on May 2, 2014.

¶ 106 We admonish counsel for claimant that discussion of the issues on appeal should be directed only at the Commission's decision, not the arbitrator's or the circuit court's decision. Only the Commission's decision  is under review by this court in this appeal. The Commission is the ultimate decision maker in workers' compensation cases. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 63 (2006) (citing *Cushing v. Industrial Comm'n*, 50 Ill. 2d 179, 181-82 (1971)). The Commission weighs the evidence that was presented at the arbitration hearing and determines where the preponderance of that evidence lies. *Id.* at 64. Consequently, we review the Commission's decision, not the arbitrator's or the circuit court's decision. *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 544 (2010). Based on that review, we will

28

either affirm or reverse the circuit court's judgment. *Id.* at 543. In the instant case, we will view claimant's arguments as directed at the Commission but caution counsel for claimant to refrain from such references in future submissions to this court.

¶ 107    We now turn our attention to the legal principles and standard of review that control our resolution of this issue. The purpose of the Act is to protect an employee from any risk or hazard which is peculiar to the nature of the work he or she is employed to do. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). To be compensable under the Act, an employee must establish by a preponderance of the evidence both that his or her injury "arose out of" and "in the course of" employment. *Litchfield Healthcare Center v. Industrial Comm'n*, 349 Ill. App. 3d 486, 489 (2004). Whether an employee has suffered a work-related accident is a question of fact for the Commission to determine. *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 38. "For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent." *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 24. The appropriate test is whether there is sufficient evidence in the record to support the Commission's finding, not whether this court may have reached the same conclusion. *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1013 (2011).

¶ 108 In the present case, SIH first contends that the Commission failed to consider the conflicting histories of accident provided by claimant in the months following the alleged accident. SIH argues that these histories are "completely different, and incongruous with one another." Specifically, SIH asserts that claimant initially reported no acute injury but an onset of symptoms after working her shift. Claimant, however, later provided the following conflicting histories:

(1) on June 26, 2014, claimant reported to Dr. Newell that she had sustained a sudden onset with injury while lifting a heavy patient; (2) on August 18, 2014, claimant reported to her physical therapist that she had increased radicular, bilateral pain in her legs, with the right side pain greater than the left side, after lifting a 400-pound-plus patient at work; (3) on April 23, 2018, claimant reported an incident to Dr. Zelby where she injured herself by moving or lifting a patient weighing approximately 500 pounds, which, according to Dr. Zelby, was a different description of the accident than she had provided to Dr. Zelby in 2015; and (4) on November 20, 2014, claimant reported to Dr. Gornet that she had sustained a second injury and developed increasing pain while lifting a patient with a coworker. SIH further asserts that because the Commission failed to consider these inconsistencies, the Commission's decision is against the manifest weight of the evidence. We disagree.

¶ 109   The Commission, in affirming and adopting the arbitrator's decision, supported its decision by relying on claimant's testimony concerning the May 2, 2014, accident and the corroborating events that immediately followed. Claimant testified as to the events surrounding the accident and described experiencing right side pain, which she had not experienced previously before May 2, 2014. Claimant immediately reported the accident to SIH, prepared a written accident report, and presented to Dr. Austin at SIH's direction. The Commission found claimant credible, noting that claimant also presented to Dr. Alexander on May 6, 2014, reporting that she had worked three 12-hour shifts the previous week and began experiencing a burning sensation in her back on April 30, 2014, and May 1, 2014, as well as a sudden onset of low back pain while at work on May 2, 2014.

¶ 110   Contrary to SIH's argument, the Commission additionally considered opposing evidence, such as the two differing accounts of accident and onset of pain provided by claimant in the months and years after the accident. First, the Commission addressed Dr. Austin's May 2, 2014, record.

30

The Commission noted that claimant reported to Dr. Austin that she "does not feel that she has re-injured back but just took on too much work too fast." However, the Commission also noted that Dr. Austin's note further states that claimant referenced the specific number of total lift patients she had to care for during her shift. The Commission also addressed Dr. Zelby's testimony regarding inconsistent accounts given by claimant. The Commission emphasized that SIH failed to cross-examine claimant concerning her purported statements to Drs. Austin and Zelby. Noting that claimant did not report a specific lifting incident and immediate onset of pain, the Commission found, nevertheless, that claimant's testimony was descriptive of an accidental injury arising out of and in the course of her employment on May 2, 2014.

¶ 111   SIH also argues that the Commission's finding that claimant sustained an injury on May 2, 2014, is not supported by the objective tests. Specifically, SIH argues that claimant's MRI scans do not show a new injury that would produce claimant's reported symptoms after May 2, 2014. Claimant responds that a close reading of the radiologists' reports reveals substantial defects, which could generate "significant symptomology" when aggravated.

¶ 112   Here, the Commission could have reasonably determined that claimant aggravated her lumbar spine condition due to "activity and heavy lifting" of numerous total lift/care patients. Again, the Commission found claimant credible, and we see no reason to disturb its credibility determination. Claimant testified at the arbitration hearing consistent with her complaints immediately after the May 2, 2014, accident. The Commission found that claimant had met her burden of proving by a preponderance of the evidence that she sustained an accident arising out of and in the course of her employment on May 2, 2014. In our view, there is ample evidence to support the Commission's finding and, therefore, we cannot say that the Commission's decision

31

is against the manifest weight of the accident. Accordingly, we now turn our attention to the issues raised by claimant on appeal.

¶ 113                                    B. Claimant's Appeal

¶ 114   On appeal, claimant challenges the Commission's decision to deny her certain benefits. Specifically, claimant argues that the Commission erred in denying her TTD benefits and reimbursement for three surgeries related to her bilateral shoulder condition. Claimant also argues that the Commission's decision to deny her reimbursement for the diagnostic test using an MR Spectroscopy was against the manifest weight of the evidence. We address claimant's arguments in reverse order.

¶ 115                         1. Medical Benefits—MR Spectroscopy

¶ 116   Claimant argues that the Commission's decision to deny her reimbursement for the March 15, 2016, MR Spectroscopy, based on the Commission's finding that the MR Spectroscopy was not reasonable and necessary treatment, was against the manifest weight of the evidence. Claimant asserts that the evidence clearly demonstrates that Dr. Gornet's use of the MR Spectroscopy was a medically reasonable and necessary diagnostic tool in determining the medical necessity for fusion surgery. We disagree.

¶ 117   Section 8(a) of the Act governs the payment of medical expenses. That provision states in relevant part:

"The employer shall provide and pay the negotiated rate, if applicable, or the lesser of the health care provider's actual charges or according to a fee schedule, subject to Section 8.2 [(820 ILCS 305/8.2 (West 2012))], in effect at the time the service was rendered for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required

32

to cure or relieve from the effects of the accidental injury \*\*\*." 820 ILCS 305/8(a) (West 2012).

A claimant bears the burden of proving, by a preponderance of the evidence, his entitlement to an award of medical expenses under section 8(a) of the Act. *City of Chicago v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 258, 267 (2011); *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 546 (2007). Questions as to the reasonableness of medical charges, the necessity of the medical services provided, and the causal relationship between the medical services and the work-related injury are questions of fact to be resolved by the Commission. *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 51; *Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 903 (2004). A court of review will not disturb the Commission's decision on a factual matter unless it is against the manifest weight of the evidence. *Dye v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 10. As noted above, a decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Ravenswood Disposal Services v. Illinois Workers' Compensation Comm'n*, 2019 IL App (1st) 181449WC, ¶ 15.

¶ 118   With respect to factual matters, it is within the province of the Commission to judge the credibility of the witnesses, resolve conflicts in the evidence, assign the weight to be accorded the evidence, and draw reasonable inferences therefrom. *Hosteny*, 397 Ill. App. 3d at 674. For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291 (1992).

¶ 119   Here, the medical experts disagreed as to the use of an MR Spectroscopy as a diagnostic tool in spinal injury cases. Dr. Treister testified that the MR Spectroscopy is not generally used to evaluate spinal conditions, and further opined that, in the present case, the measurement of the

33

chemical content following claimant's spinal surgery is of no medical significance. In contrast, Dr. Gornet testified that an MR Spectroscopy, a "validated diagnostic" by the FDA, was a reliable diagnostic tool to determine whether someone needed treatment. Dr. Gornet further explained that he had been involved in discussions with numerous physicians about bringing the technology to Rush Presbyterian Hospital, although he also acknowledged that there were only three offices in the country that currently used spectroscopy to evaluate spinal patients.

¶ 120 Essentially, claimant's arguments amount to a request for this court to substitute our judgment for that of the Commission, or reweigh the evidence, which we will not do. *Setzekorn v. Industrial Comm'n*, 353 Ill. App. 3d 1049, 1055 (2004). In this case, the Commission resolved the dispute in favor of SIH and provided its reasoning. Given the conflicting medical opinions, we cannot say the opposite conclusion is clearly apparent. Accordingly, the Commission's decision to deny claimant's incurred medical expense for the MR Spectroscopy procedure was not against the manifest weight of the evidence.

¶ 121 As a final comment regarding this issue, we note that claimant advocates that "the ruling of this Court should be clear that its finding is limited to the reasonableness and necessity under the facts of this case, and is not a blanket holding that all [MR] Spectroscopy tests are unnecessary and unreasonable and will not be covered in Illinois workers' compensation cases." However, it is not the function of this court to provide the Commission and/or scientific or medical professionals with guidance on theoretical matters, and we decline to do so here.

¶ 122                    2. Medical Benefits—TTD and Shoulder Surgeries

¶ 123 Next, claimant challenges the Commission's decision to deny her TTD benefits and reimbursement for her three shoulder surgeries. Claimant, however, does not challenge the Commission's finding that her steroid injections after July 2, 2014, were not reasonable or

34

necessary. Claimant frames her challenge as a legal question. In particular, citing *International Harvester Co. v. Industrial Comm'n*, 46 Ill. 2d 238, 245 (1970), claimant asserts that the Commission failed to apply the correct legal test, the "but/for" test, in denying her TTD benefits and reimbursement for her shoulder surgeries based on a lack of causation.[2] Claimant, therefore, asserts that the applicable standard of review is *de novo*. In the alternative, claimant argues that the Commission's finding is against the manifest weight of the evidence "because the evidence is overwhelming and undeniable."

¶ 124    In contrast, SIH asserts that whether the claimant's condition of ill-being is causally related to her work accident is a question of fact for the Commission. Additionally, SIH argues that entitlement to past medical expenses and TTD benefits are fact determinations. Thus, SIH asserts that the applicable standard of review is manifest weight. Lastly, SIH argues that "the only potential legal question involved in this appeal is whether SIH can, as a matter of law, be liable for a condition that was caused by treatment that was not reasonable and necessary and administered by claimant's chosen physicians." Given that the parties disagree as to the proper standard of review, we will address that issue first.

¶ 125    The standard of review, which determines the level of deference to be afforded the Commission's decision, depends on whether the issue presented on appeal is one of fact or one of law. See *Johnson v. Illinois Workers' Compensation Comm'n*, 2011 IL App (2d) 100418WC, ¶ 17. Our review of the Commission's factual findings is limited to determining whether such findings are against the manifest weight of the evidence. *Id.* "Commission rulings on questions of law are reviewed *de novo*." *Id.*

---

[2] See *International Harvester Co.*, 46 Ill. 2d at 245 (in the context of an independent intervening cause, "cases have applied a 'but for' test, basing compensability for an ultimate injury or disability upon a finding that it was caused by an event which would not have occurred had it not been for the original injury" (emphasis omitted)).

¶ 126 Here, claimant asserts that the Commission "misapplied an erroneous standard that if some of the medical treatment resulting from the original injury was found to be unreasonable and unnecessary, then such a finding would break the causal chain between the original work injury and the resulting medical condition." We disagree. The Commission's denial of TTD benefits and reimbursement for claimant's shoulder surgeries was based upon its finding that claimant failed to prove a causal relationship between her avascular necrosis and the May 2, 2014, accident. Nothing in the record supports claimant's assertion that the Commission found the steroid injections after July 2, 2014, to be an intervening cause that broke the chain of causation. To the contrary, based on Dr. Paletta's opinion and Dr. Treister's second utilization review report, the Commission adopted and affirmed the arbitrator's finding that the 15 "steroid injections after July 2, 2014, were not medically reasonable and necessary *to cure the effects of the accident of May 2, 2014*." (Emphasis added.) In fact, none of the medical experts addressed the issue of an intervening cause at the arbitration hearing. Claimant, instead, argued that all of the steroid injections were reasonable and necessary and causally related to claimant's lumbar spine condition following the May 2, 2014, accident. Thus, contrary to claimant's argument, in adopting and affirming the arbitrator's decision, the Commission ruled that the causal relationship ended on July 2, 2014.

¶ 127 Given that the Commission's decision that claimant's bilateral shoulder condition was not causally related to the May 2, 2014, accident, the appropriate test on appeal is whether there is sufficient evidence to support the Commission's decision. Accordingly, we will review the Commission's decision under the manifest-weight-of-the-evidence standard. *Id*.

¶ 128 Claimant argues in the alternative that the Commission's decision that claimant failed to prove causation is against the manifest weight of the evidence. Although not raised by SIH, we note that claimant has forfeited review of this decision by failing to support her argument.

36

Claimant's argument is almost entirely based on a *de novo* review—limiting her alternative argument to a mere three sentences with no citations to the record. Given claimant's failure to comply with Illinois Supreme Court Rule 341(h)(7), we conclude that claimant forfeited any issue on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (arguments "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities"; points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing).

¶ 129   Forfeiture, however, is a limitation on the parties, not on the court. *John Deere Harvester Works v. Industrial Comm'n*, 258 Ill. App. 3d 778, 780 (1994). When necessary to maintain a sound and uniform body of precedent, we may overlook forfeiture and address the merits of the issue. *Id.* at 780-81. In this case, we elect to address the issue in order to maintain a sound body of precedent.

¶ 130   Although the ultimate determination of issues presented to the Commission depends upon an assessment of the facts and circumstances of each particular case, that assessment must be made under our established legal standards. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 194 (2002). To be compensable under the Act, a claimant's work-related accident must be a causative factor in his condition of ill-being, but it need not be the sole or primary cause. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). "Every natural consequence that flows from an injury that arose out of and in the course of the claimant's employment is compensable unless caused by an independent intervening accident that breaks the chain of causation between a work-related injury and an ensuing disability or injury." *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005). We reiterate that questions as to the reasonableness of medical charges, the necessity of the medical services provided, and the causal relationship between the medical services and the work-related

37

injury are questions of fact to be resolved by the Commission. *Shafer*, 2011 IL App (4th) 100505WC, ¶ 51; see also *Max Shepard, Inc.*, 348 Ill. App. 3d at 903.

¶ 131 Here, the Commission, in rendering its causal-connection decision, focused solely on the medical necessity of the claimant's steroid injections after July 2, 2014. Consequently, the Commission failed to consider the additional evidence that clearly demonstrates a causal connection between claimant's lumbar spine injury and claimant's avascular necrosis resulting from the steroid injections she received as treatment for her lumbar spine injury. Although the Commission found that the steroid injections after July 2, 2014, were not medically necessary, SIH cannot reasonably argue that claimant received the additional injections for some purpose other than treatment for her lumbar spine injury. In support of the Commission's decision, SIH cites *Zick v. Industrial Comm'n*, 93 Ill. 2d 353 (1982), and *Reynolds v. Danz*, 172 Ill. App. 3d 907 (1988), as dispositive of this issue. SIH asserts that these cases establish that an employer cannot be liable for any condition caused by treatment rendered by a claimant's chosen physicians that the Commission found was not reasonable and necessary. We disagree and find neither case factually analogous.

¶ 132 In *Zick*, the claimant sustained a work-related foot injury in a forklift accident. *Zick*, 93 Ill. 2d at 355. The claimant eventually underwent surgery. *Id*. at 356. The claimant's treating surgeon removed claimant's sesamoid bones, which are small bones located in the tendons, and inserted a metal pin in her great toe. *Id*. However, the claimant's condition failed to improve, so she underwent two follow-up surgeries. *Id*. The claimant eventually developed reflex sympathetic dystrophy, "a condition which is triggered by an injury and results in fibrosis of the muscles, stiffness in the joints, pain, and an atrophy of the bone." *Id*. The medical experts disagreed as to the extent of claimant's foot injury. *Id*. at 356-58. The claimant's treating surgeon believe that the

claimant sustained a sesamoid bone fracture in the joint of the great toe. *Id*. at 356-57. Two opposing physicians and a radiologist disagreed, opining that claimant suffered from a congenital foot condition, which resulted in the sesamoid bone beneath the distal first metatarsal of the left foot developing into two pieces, instead of one normal bone. *Id*. at 357-58. The Commission resolved the conflict in favor of the employer, finding that the two follow-up surgeries were related to the congenital anomaly and caused the reflex sympathetic dystrophy and not the work-related foot injury. *Id*. at 360. In affirming the Commission's decision, the Illinois Supreme Court stated the following:

> "In the instant case, claimant voluntarily submitted to treatment by a physician of her choice. Where such treatment results in a disability *unrelated* to an injury sustained during employment, it would be unjust to hold the respondent liable." (Emphasis added.) *Id*. (citing *cf. Collier v. Wagner Castings Co*., 81 Ill. 2d 229, 238 (1980) (the likelihood that plaintiff's chosen doctor would inflict emotional distress is plaintiff's risk, not the employer's).

¶ 133 In *Zick*, although the employer presented evidence of possible mistreatment of the claimant's condition, the question presented was "whether [the claimant's] disability resulted from trauma [sustained in the forklift accident], or whether it was due to a congenital anomaly aggravated by medical mistreatment." *Id*. at 359. The Commission found, and the *Zick* court later affirmed, that the claimant's current condition of ill-being resulted from medically improper and unnecessary surgeries that were *unrelated* to the accidental injury. *Id*. at 360. In contrast, here, there is no question that claimant's treatment in the form of steroid injections was for purported symptoms *related* to her condition of ill-being in her lumbar spine—a condition that the Commission found to be caused by the May 2, 2014, accident. Thus, we find *Zick* inapposite to

39

the present case.

¶ 134    SIH also relies on *Reynolds*, even though *Reynolds* involved an interlocutory appeal from a partial summary judgment in a legal malpractice case. In *Reynolds*, 172 Ill. App. 3d at 908, the plaintiff brought a three-count legal malpractice suit against his attorney. In the first count, the plaintiff claimed that his attorney failed to properly handle the plaintiff's workers' compensation case. *Id*. The circuit court later granted summary judgment in favor of the plaintiff, finding that his attorney had committed legal malpractice by missing the judicial review deadline of an adverse decision that was against the manifest weight of the evidence. *Id.*

¶ 135    Following the grant of summary judgment, the circuit court certified two questions for interlocutory review:

"1) Was the decision of the Industrial Commission against the manifest weight of the evidence or contrary to Illinois law when the Commission found as follows:

The Commission further notes that the evidence presented on review basically addressed the question of Petitioner's condition of ill-being subsequent to the February 4, 1982 surgery, but not the threshold issue of whether or not that surgery was reasonable and necessary as the result of the accident of May 7, 1980, and also references *Zick* [citation]. ? and

2) Even assuming, arguendo, that the Commission was correct in its finding that the surgery was not reasonable and necessary as the result of the accident of May 7, 1980, is an employer liable under the Workers' Compensation Act for a condition of ill-being or disability resulting from such surgery where the surgery was performed by a physician of the employee's choice?" (Internal quotation marks omitted.) *Id.* at 909.

The *Reynolds* court provided a summary of the facts giving rise to the plaintiff's workers'

compensation claim. The plaintiff, an electrician-welder, hurt his back lifting a steel I-beam on May 7, 1980. *Id.* The plaintiff received conservative treatment and, several months later, returned to work with no limitations. *Id.* at 910. However, the plaintiff was later fired from his employment for not wearing safety glasses. *Id.*

¶ 136 After his dismissal, the plaintiff presented to a neurosurgeon, at his attorney's recommendation. *Id.* The neurosurgeon, noting the plaintiff's complaint of back pain, recommended full activity that the plaintiff "be as active as possible." *Id.* Following this recommendation, the plaintiff engaged in a variety of activities, such as scuba diving, building a shed, chopping wood, and motorcycling. *Id.* The plaintiff subsequently returned to the neurosurgeon, complaining of worsening low back pain. *Id.* Without any further medical tests, the neurosurgeon performed a lumbar laminectomy, where he noted that the plaintiff had a protruded disc at the L5, S1 interspace level. *Id.* The plaintiff later testified at the arbitration hearing that his condition deteriorated after the surgery. *Id.* at 911. The arbitrator subsequently denied the claim. *Id.* The arbitrator found no evidence that the surgery was necessary or required and that plaintiff's current low back problems existed subsequent to surgery not necessitated by the May 7, 1980, accident. *Id.* The Commission affirmed the arbitrator's decision. *Id.* The Commission's decision was not appealed. *Id.*

¶ 137 In answering the certified questions in the negative, the *Reynolds* court reiterated the Illinois Supreme Court's holding in *Zick* that "the employer's liability is limited where treatment by a physician of the claimant's choice results in a condition of ill-being unrelated to a work injury." *Id.* at 913. The *Reynolds* court found ample evidence in the record to support a finding that the plaintiff's condition as a result of the accident did not justify surgery. *Id.* at 913-14. Furthermore, the *Reynolds* court noted that the neurosurgeon "could not state from objective

41

evidence that the protrusion had developed as a result of plaintiff's work-related injury in 1980." *Id.* at 914.

¶ 138    In the present case, although the Commission found that there was no medical need for further steroid injections after the July 2, 2014, injection, the record demonstrates that claimant's treating physicians continued to administer steroid injections to alleviate symptoms *related* to claimant's lumbar spine injury. Therefore, unlike *Reynolds*, where the medical treatment was *unrelated* to the petitioner's work accident, here, claimant's medical treatment, in the form of steroid injections, was *related* to her work-related injury. For that reason, *Reynolds* and *Zick* are both inapposite to the present case. Rather, here, the administration of the steroid injections by claimant's treating physicians, albeit questionable, was directly related to claimant's symptoms from her condition of ill-being in her lumbar spine. The record demonstrates that claimant was in excellent health prior to injuring her back in 2013, a condition that she subsequently aggravated in 2014, and it is undeniable that the treating physicians, Drs. Alexander (or his physician assistant), Newell, and Criste, ordered the steroid injections to alleviate claimant's subjective complaints of pain stemming from her back injury. Consequently, it is clear from the record that, absent these complaints, claimant would not have received steroid injections.

¶ 139    Accordingly, we conclude that the Commission's denial of reimbursement for claimant's three shoulder surgeries was against the manifest weight of the evidence. Because the Commission's denial of TTD benefits associated with claimant's shoulder surgeries was based on its determination that the surgeries were not causally connected to the work accident, we reverse the Commission's decision and remand for a determination of TTD benefits consistent with this order.

42

¶ 140                                    III. Conclusion

¶ 141   Based on the foregoing, the judgment of the circuit court of Jackson County is affirmed in part and reversed in part. We reverse that portion of the judgment that confirmed the Commission's finding as to the denial of reimbursement for claimant's three shoulder surgeries, and we remand the case to the Commission for a determination of associated TTD benefits. The judgment of the circuit court is affirmed in all other respects.

¶ 142   Circuit court judgment affirmed in part and reversed in part; Commission decision reversed in part and remanded for further proceedings.